And just for the record, go ahead and state your appearance again. Siobhan Sheridan Ayala, on behalf of petitioners Maria Isabel Vargas and Jose Filamino Valencia Barón, I'd like to reserve two minutes for rebuttal again. Thank you, your honors. The first issue, which is not actually necessarily dispositive in this case, is whether or not there is a particular social group that the petitioners belong to. And the social group is landowners who own land that is within close proximity to the U.S.-Mexican border. Is that the only social group you're alleging? No. Within the motion to reopen, we also alleged a family as a social group. And there are seven members of the family that have been either murdered or who have been under death threat or attempted murder. Why did you only raise that 15 months after the Board of Immigration Appeals decision? Weren't you out of time? Well, your honor, under changed circumstances is a basis for filing a motion to reopen. And that can be filed at any time when you show changed circumstances. So I'm not sure why the previous attorney didn't raise the family as a social group. She tried to raise it in the appeal to the Board of Immigration Appeals. However, it was late at that time. Well, actually, at the time of the immigration judge's decision, she already had that information. And the immigration judge told her to file a motion to reopen, right? Right, she did. But a requirement for a motion to reopen is you need to show that something could not have been presented at the initial hearing. And she presented the information at the initial hearing. So I'm not sure exactly that was a strategic call that she did not file that motion to reopen. But we filed it later. Under matter of ACOSTA, which was issued 30 years ago, that case identified land as an immutable characteristic. Land is an important innate characteristic, particularly in a place like Mexico, where weddings, funerals, burrs happen on land. Ms. Vargas inherited the land from her grandmother, and that's on the record. Isn't the issue here whether it was actually defined specifically? I mean, I was wondering, what evidence did you actually present that this had to do with the fact that they were landowners along this 2,000-mile border as opposed to just them? Right, well, I understand there's this 2,000-mile border, but the actual number of houses that buttress the border is actually a lot smaller than 2,000 miles. There's only a particular number of border towns along the border from California to Texas. And there's only a particular number of houses within that that buttress the border. So I'm sorry, I don't quite understand your question, Your Honor. It wasn't very good. Maybe it is. What evidence did you present that this is a general problem for landowners along there? Did you present evidence about any other instances? Yes. The petitioners testified that one of their neighbor's house was also burned down, and that neighbor's business was also burned down. And what matters under Henricus Rivas is the perspective of the persecutor. And so the persecutor is clearly going after them for this strategic location of their house because they want to build a tunnel in the home to smuggle drugs and human beings from Mexico to the United States. So, but as Your Honor pointed out, family is also a social group that was proposed in the motion to reopen. I wanted to move on because this, well actually I'll finish this thought, I'm sorry. In Cordoba v. Holder, this court has found that Mexican landowners is a social group, and that's also supported by the Seventh Circuit in another case. I'm not sure that Cordoba actually got to that point because Cordoba winds up saying we're going to remand because the BIA didn't have the benefit of Hernandez Rivas at that time. It acknowledged that it could be. Since then we've had development. The BIA has re-articulated what the standards are for social group, and I think those are the standards you're going to have to deal with now. So what is it that makes the social group you're now proposing, either one of them, qualify under the standards now set by, I get lost in which set of initials, which is it? WGR? WGR, I guess is what I'm thinking about because that's the one that came to this court. Okay. Well, it's immutable, as you mentioned, because the matter of Acosta mentions land, and for the reasons that I mentioned, it's particular because of the fact that there's only a particular number of houses or pieces of land that buttress the border, and it's socially distinct in the fact that there's only— that's—look, on Hernandez Rivas, you look at what the perspective is of the persecutors, and the persecutors have a distinct idea of who is in this category. So that is why it will count as a particular social group. I wanted to move along to credibility. Why is credibility before us? Because— I mean, the IJ cast dispersions, but I don't think the BIA relied upon that, so I don't think there's an issue in front of us, is there? Well, if the court finds that there's a social group, then they would need to make a ruling on credibility. But who makes that ruling? I don't think it would be us. I think it would be the BIA. Okay. Well, then I— I think you've—for the moment, the BIA has said, okay, accepting them is credible, so at this point, we accept them as credible as well. Don't take points off the board. Okay. Okay. Well— Talk about internal—are you going to talk about internal relocation? Yes. Under— Yes. It's not reasonable for them—so, for withholding, and if they qualify for asylum, they're not required— there's a rebuttable presumption that if they show past persecution and there was three attempted murders of them, then there's a rebuttable presumption that they would face future harm. And then it's not their burden to show relocation. Well, it may become the government's, but that's still a question. It's still a question. I mean, it's clear they're prepared to relocate. They have relocated. They've come to this country, so why can't they relocate elsewhere? Well, their daughter tried to relocate three times, and she ended up having to come to the United States also to seek asylum. But is that because—what's happened to the property? Is somebody living there now? No, it's abandoned. So why does the gang care about this family if the property's abandoned and they can have access to it? Because of a vendetta they have against the family. But there's no evidence of that. Well, there is, Your Honor. There's—as I mentioned, they've murdered— the gang has murdered the son-in-law, murdered the godson. Was still there. In Mexico, right. Well, not just Mexico, in that part of Mexico. It seems—I understand your case with regard to that location, but there's been nothing that I've seen that demonstrates that the problem is with this particular family. The problem is with that location. And if the family's away from that location, what's the problem? Well, like I said, the daughter tried to relocate three times. Additionally, it has to be reasonable that they relocate. They're both of retirement age. Well, they've relocated here. How hard could it be for them to relocate elsewhere in Mexico? Because they're at the hands of a very large and powerful drug cartel that has a very—I mean, like I said, there are seven— Whose interest in them is tied to a location they no longer are interested in living at. No, Your Honor, I'm sorry to disagree with you. You're requiring me to accept as a premise that there is evidence, or more specifically, that the IJ and BIA, the evidence compelled those organizations to conclude that there was something aimed at these individuals separate and apart from their status as landowners next to the border. If they're not landowners next to the border, then they don't fall within that own social group any longer, and I don't see what the problem is. But the problem, Your Honor, is that's why it's a social group, because it's—first of all, the land ownership, it's an innate characteristic. It doesn't disappear when you no longer become— Not once they've abandoned it. If they're living someplace else in Mexico, and they're not claiming possession over this property, what's the problem? But that was the case in Cordoba, and that was the case in NLA. In both cases, the people who owned the land no longer were residing in those— In Cordoba, it was that they were wealthy landowners, and that was identified as a class that the— I've forgotten the name of the terrorist organization—aimed at. And there's been nothing to suggest that your clients fit that category. They're not wealthy landowners. They have the misfortune of owning land that happens to be at a place the cartel wants, because it's next to the border. But Cordoba, it was Mexican landowners, because there was two petitioners in that case. And the Mexican landowner, the second petitioner, he had already abandoned the land, and he was in hiding. And as I mentioned, the motion to reopen suggests a second and alternative social group of family, which it is clear, as I mentioned, they murdered the godson who was not a resident of— I want to make sure we're talking about the same case. I look at Cordoba, and it says, in and near Cali, Colombia, as well as some family businesses. He was a rich man. That's the first petitioner. There is a second petitioner who's from Mexico. In the same Cordoba case? Yes. Okay. Did you provide any evidence that they could not relocate internally? I mean, apart from—I guess maybe we need a definition. I mean, that they could not go to some other part of Mexico? Your Honor, apart from the fact that they're elderly, and that their family are under death threats, no, there is no other evidence that they cannot relocate. Like I said, it's not their burden to show that under asylum, and protection under the Convention Against Torture. They also—it's not necessarily—it's not their burden either. It's something for the court to consider. It is their burden under withholding. Your opening brief, the entire argument, appeared to be based on the government's acquiescence, not so much about relocation. Right. We didn't brief that issue in the opening brief. And yet it was cited by the BIA. So why is that not a waiver? I'm not sure, Your Honor. Okay. And I've lost my— What evidence did you— Go ahead. I'm sorry. What evidence did you present or try to present in your motion to reopen that these additional deaths were, one, family, and two, related to your petitioner's claim of being a family subject to violence from these gangs? There was a newspaper article regarding the son-in-law's death. He was actually not— I read it. Yeah. It's not technically the son-in-law. They weren't actually married. But in Mr. Valencia, in his asylum application, stated that the cartels came and they asked specifically for his wife or his common-law wife. And then the godson, also in the asylum application, the godson, they asked specifically for Mr. Valencia. In the 28J letter that we've also provided to the court, the BIA remanded a case for the grandson where the—there's rebuttal. Excuse me. I'm past my two minutes for rebuttal, so I'm going to stop. No, no, no. I'll give you a little extra time. That's fine. Okay. The grandson also was specifically asked by the cartel about the grandfather. We'll give you two minutes in rebuttal. Okay. Thank you. Good morning. Greg Pennington on behalf of the Attorney General. As Judge Clifton pointed out, after Cordoba, the board issued its precedent decision in the matter of WGR. Does the government really want to encourage landowners at the border to turn their property over to the cartels? Absolutely not. I think that would be a lose-lose for both countries. Then I don't really understand the government's position in this case. Why is it resisting so hard somebody who tried to keep from giving the property over to the cartel? Because that's what our asylum law requires. We obviously, for practical reasons, don't want the border ceded to the cartel. So what's the practical effect of the position the government's taken in this case? It sounds to me like it's ceding the border over to the cartel. Well, I don't think there's any evidence, and that's what this case falls on is a lack of evidence, that that's happening along the entire border. Now, do we care only about the entire border? It's okay with us that they take over particular properties right at the border so they can dig the tunnel there. As long as they don't dig a tunnel through every parcel along the border, that can't be the government's position. No, we don't want tunnels anywhere along the border. So let's go back to this property. If we accept petitioners as credible, and that seems to be the posture of the case here, the story they tell suggests that their problems come from trying to resist the cartel's use of their property to dig a tunnel across the border. Is there something I'm missing there? No, that would clearly – well, I don't want to say clearly, but that suggests that that's the motive of the cartels here. But we didn't even get to motive or nexus or anything like that. Under asylum law, you have to establish membership in a protected class before you can even move on. So let's stick with our protected class. Why is it that people that own property at the border shouldn't qualify as a protected class if the reason they're in trouble with the cartel is that they've got that property? If they resist, the cartel doesn't like it. That seems to be a poorly identifiable class. I'm not saying it can never be a particular social group, but it's an applicant for asylum's burden to demonstrate that that group is particular enough and is socially distinct within society. Now, there may be evidence. It's not particular or socially distinct about the group I just identified. Not hard to figure out who owns houses at the border. Right. Not hard for the cartel to figure that out either. That's the problem. Right, but as the board suggested here, that it's a long border, and as Judge Bucklow mentioned, it's a long border, and we don't have any evidence that Mexican society views this as a particular group, and that's what we're looking for. Well, I mean, the cartels appear to view the border as being an area of interest, and I think the U.S. government identifies the border as an area of interest. Heaven knows there's enough talk about building a wall and building other partitions to separate us off. So the border is somehow special as far as the U.S. government is concerned. Not hard for me to figure out the cartels have an interest. So why isn't that specific enough? Well, it might be easy to figure, but it's an applicant's burden to provide evidence of this. How much evidence can it take for something we all see or appear to see? I mean, you appear to be conceived. So how much evidence does it take to say that that's an identifiable group? Some, any. As I searched the PDF of the record in this case, there was no mention other than in briefing and in the decision of landowners in the country evidence. There's just nothing. Is there any evidence that there's a border between these two countries? I think that's evident, yes. Well, is there evidence in the record about that, or is that something everybody can figure out? Which seems to me that the proposition that the border is a place of interest is something that everybody can figure out. I don't know what evidence would be required to establish that. Well, you would want evidence that landowners is a socially distinct group, as viewed by Mexico. I mean, as Mexican society views it, and as the board held it. Is it just Mexican society, or would the cartel qualify? The perspective of the cartel is that, okay, they're interested in terrorizing the whole population, but their particular interest is getting a tunnel across, and if you can get a house next to the border, that's a better place to start a tunnel across. I mean, all of that seems to be pretty self-evident. So I'm puzzled as to what it is that's this absence of evidence. Well, as the court held in Enriquez Rivas, the persecutor's motive is a factor. The court held that it was a major factor, but the board disagreed in matter of WGR. They said that it's viewed through society, through evidence of expert witnesses or historical animosities against certain groups or laws targeting certain groups. This is the kind of evidence that we're looking for to find out if a group is viewed as a distinct segment of society, and that goes to the social distinction. And there's just no evidence that says anything about landowners. And before this court, it's petitioner's burden to say that the record compels a conclusion that this group is socially distinct or that it's defined with particularity. And as I said in my brief, it's not just, you know, homeowners along the Mexican border. It could be any kind of landowner. It could be, you know, rural or agricultural or commercial. We just don't know what it is we're trying to narrow down. And as we want predictability in the law, we want to know some finite bounds of what this particular social group definition is. And that's what the board has attempted to do over the past 30 years, is try to refine a definition for this group which we don't have any legislative history on and we don't have anything from the UNHCR on. It's just, as this court recognized when it deferred to WGR and Garay-Reyes, it's just an amorphous group that we just don't know anything about. And the board is left to decide what are the bounds on a case-by-case basis. And when there's just a lack of evidence entirely on particularity, as this court said in Garay-Reyes, we're looking at evidence of particularity through the eyes of the Mexican society. And as the board said in matter of WGR, maybe in an underdeveloped oligarchical society where land ownership is absolutely unique, then we might have a group that's particular enough. It's not the whole country. We don't know how many landowners there are in Mexico or anything. There's just no evidence. And with no evidence, you can't compel a reasonable fact finder to find that this group has particularity and a social distinction. If we leave that and we go to the Convention Against Torture, would you agree that they're certainly, I mean they've certainly shown that they were the subject of attempted murder, and the government, despite what the BIA found, showed that it could not protect them, at least taking their statements as true. So why shouldn't we, and didn't the BIA put the burden improperly on them to show that they could not relocate? Okay, Judge Bucklow, starting with your last point about the burden, I don't think it's exactly clear. The IJ said that there was no testimony on whether they could relocate, and the evidence suggested otherwise. So I don't think the word burden was ever used, and I think you're getting at Maldonado where the court held that you can't place the burden. It's just one factor to be considered. But I think that's what the immigration judge did here. You know, in the footnote on the last page of the decision, he found that there was no past torture. He looked at the evidence submitted by the government that the Mexican military is trying to do what it can to take out these cartels from the top down and to clear these well-known trafficking routes to make it safer for the population. This has been a strategy from Peña Nieto since 2006. And then he also looked at relocation. So it looks like they considered all the factors, but I don't think it's clear that it was improperly placed the burden. Well, he ignored their testimony that they were told, it's a good thing you left, don't come back, they're going to kill you, and repeated attempts culminating in shooting at their house and then burning their house down. Well, that goes. That unless there's a change would indicate that they are presumably in severe danger of being killed, which amounts to torture, I think, if they return. Right. Well, what you're referring to, I think, would be more along the lines of whether the government is unable or unwilling to protect them, which is... It is. That's exactly. And that's the standard for asylum and withholding of removal. For Convention Against Torture, we're looking at whether the government or a local official acting under color of law is going to acquiesce, and I think as this Court has defined it, it's knowledge or awareness of torture prior to that torture occurring and then saying, we're just going to look the other way and do nothing about it. And I think that's a distinction that has to be made here because the agency never got to unable or unwilling to protect in the asylum and withholding claims because they found that they didn't belong in a particular social group, period. So there was no, was there a nexus to the particular social group or was the government unable or unwilling to control? I think it's completely separate when you're looking at the Convention Against Torture, and it's kind of a higher standard when you're looking at whether these government officials have knowledge of torture that's going to be more likely than not to occur and then turn their backs on it. And there's just no evidence that, in this general country-conditioned evidence, that the Mexican government does that. I mean, there have been reports of torture, but specific to these petitioners, whether the government's going to turn a blind eye. I mean, the police, they did investigate. Well, they took reports. Petitioners claim they didn't investigate, but it's not clear whether they investigated or not. So the police weren't just acting willy-nilly to their claims. They showed up and they took reports. And there's just no evidence specific to these petitioners that the government's going to turn a blind eye to torture. And I have a couple minutes left, so I'll move on to the motion to reopen. So an untimely motion to reopen. One of the exceptions, the only one claimed here, is whether changed country conditions now make them eligible for asylum where they previously were not. As this Court kind of laid out in Toofiegie, there's a lot going on here. You have to show new evidence that's material, has individualized relevancy to the claim, and that the new evidence, when coupled with the evidence submitted at the prior hearing, now make the applicants on the motion to reopen eligible for asylum or withholding of removal. And with the motion to reopen, they just submitted more of the same, really. I don't know if you can fairly say it's more of the same. If the evidence is that conditions have worsened, I'm puzzled as to the characterization of that as cumulative, since the whole point is they've gotten worse, so it can't be the same evidence as before. Well, they have to demonstrate that it's qualitatively different. Well, if it's a whole lot worse, how is that not different? I don't know that it makes it a whole lot worse just by these articles. They are dated 2015, but if you look, they're talking historically. The Board acknowledged that the evidence included indications that conditions had worsened right after it described the evidence as cumulative, and to me that seems inconsistent because on the face of it, it's not the same evidence as before of what the new evidence is as the conditions have worsened. By definition, that's a different bit of evidence. Now, maybe it hadn't worsened to a condition to qualify, but the description of it as cumulative makes me wonder what they thought they were looking at. The way I read the motion to reopen decision is that it was kind of a fallback argument that, well, even if this is qualitatively different, the evidence that the murder rate has gone up, which it isn't really clear that it has. I think one of the articles says it's gone down. Well, the State Department says things have gotten worse, so I think we have to accept the proposition that there's evidence that things have gotten worse, and the question here, as I understand it on a motion to reopen, is whether petitioners made that a prima facie case. Right, and that's what they kind of went on to is that, well, even if we consider this rise in murders, it's not relevant to the claims they're making in the motion to reopen. They're saying, well, I'm going to be harmed on account of my land ownership or on account of my family membership, but they submitted no more evidence to change the agency's prior decision. There was nothing submitted regarding landowners again. There was nothing submitted that the murder of the quasi-son-in-law, that specifically relates to this family. It does relate to the family, but there wasn't any evidence submitted regarding particularity and social distinction. The board's recently come out with another opinion regarding family membership, as it did in WGR, so they're sticking to their particularity requirements and social distinction requirements. Some evidence that family membership in this country is viewed as socially distinct, and there just wasn't any evidence submitted with the motion to reopen. It was just the general country condition evidence, and this court has held that evidence with the motion to reopen has to have individualized relevancy to the case for asylum. And how is it the evidence with regard to the son-in-law doesn't have individual relevancy? It might have individual relevancy to a family membership claim, but there wasn't any evidence that this family member was killed on account of family membership, and I think that's what the board kind of said is, well, on top of— I thought the indication was he was trying to protect his wife, who's the common-law wife, who's the daughter. Right, so in the declaration on the new application for asylum they submitted with the motion to reopen, he said that the mafia came looking for the daughter, and the son says, whatever you have with my wife, take it to me, and that's why he was murdered. So how does that not relate to family? I mean, that seems all about family. Well, they have a heavy burden in a motion to reopen to show that a new removal proceeding is worthwhile. I mean, that's why such abusive discretion standard applies. We need to know that with the reopened proceeding, there's a reasonable possibility they're going to succeed on a claim, here a claim that they've already submitted and a new claim that they just presented very scant evidence on. And I see my time is up if there's no more questions. Unless there are any other questions? No. Thank you, Counsel. Thank you. We'll go full—yeah, two minutes. Thank you. Thank you, Honors. I wanted to focus on the Convention Against Torture and my rebuttal time. There are at least 100 references to corruption in the record. Mexico is a very corrupt country, and the record is replete with that evidence. The corruption is at all levels of government, and it is specifically with bribes with local police, and it goes on up. There was police that were present at all of the attempted murders of the petitioners. The public minister came to take a report after the shooting of their car. Police came to the house the night that the house was shot up, and then the police were on the scene when the house was burned down. In all of this, they said the petitioners testified did not lead to investigation. As Judge Bucklow stated, the petitioners ran into a police officer in Nogales, Arizona, afterwards, and the police specifically told them that they were glad that they had left the country because they would have been killed. The Ninth Circuit has held that the acquiescence by government officials does not require actual knowledge or willful acceptance. Rather, awareness and willful blindness by government officials is sufficient, and I submit to the Court that that is what is happening in this situation. I want to switch gears to go to the social group analysis regarding family. The matter of LEA was published after this case came out, which is a case from the Board of Immigration Appeals, which requires the showing of social group for family. So if the Court finds that family is a social group and determines that that is not met, we ask the Court to remand on that basis. Thank you. Thank you very much, counsel, for your argument. This matter is submitted, and this panel is adjourned, I believe is what I'm supposed to say. This panel is adjourned. Thank you.
judges: Clifton, Owens, Bucklo